We proceed to the next case, Warren Guymon v. Workers' Compensation Comm'n, 4-11-0074. Counsel, please. Thank you, Your Honor. Terry Dodds v. the petitioner and the jury. Please report to counsel. Your Honor, I'm Terry Dodds from Bloomington. My client, Jeannie, Marilyn, I'm sorry, Jeannie Guymon is also present. She doesn't like for me to call her Marilyn because she's in the other room. I thought they were going to come in for the argument. I don't get the opportunity to appear before you too often, so I'm gracious that I have this opportunity. Before I get into the heart of my argument today, let me first begin by saying to this panel that this case is a case of exacerbation or acceleration in the clearest sense. Before you get too far into it, I think we need to call your attention to a matter for future guidance. I'm sorry. Yes, sir. You devoted a large portion of your brief to a discussion of two commission decisions. Those should not be cited. They're not presidential. You should never cite a commission decision. Are you aware of it? No, I was not aware of that, Judge. I'm sorry. Check global products case. Global products? Yeah. Okay. My apologies. 302 Illinois Appellate 3rd, 408. I apologize for that. I will not do that in the future, obviously. In any event, what I was saying is that I believe that this case is a case of exacerbation or acceleration in its clearest sense. I listened to the other oral arguments previous to ours, and I was kind of set aback because we basically have two different extremes here. Counsel stated that the commission gave them a 14-page opinion as to why they made the decision they did. It came to the conclusion that they did, whereas we simply got a three-sentence, one-page paragraph that overturned the arbitrator's decision, essentially saying that Arbitrator Mathis failed to address the issue of causation. Not that he failed to address it adequately, but he failed at all to address the issue of causation, which is clearly not the case if you read the arbitrator's decision, which I'm sure you have. It is also one of the things that the court judge had a problem with. He stated on the record at our hearing in that case, in that stage of proceedings, that he believed it clearly erroneous for the commission to come to that conclusion that Arbitrator Mathis had not reviewed the issue of causation. And what the facts are, and which I'm sure the court is well aware of, is that on January 14, 2006, Marilyn Guyman was the employee. She was working for Linder's Bagels there in Mattoon, and she was taking out trash to the dumpster with a fellow employee when she slipped and fell on a floor that had been squeegeed earlier that was either still wet or had frosted over, and she fell and hit her head very hard. She hadn't had any difficulties prior to that time. She wasn't seeking any medical treatment for her back or neck. And there certainly isn't any medical evidence that she had any type of spinal cord damage or any disc bulges prior to that time. Now, did you proceed, or are you proceeding in a theory of an aggravation of a pre-existing condition? Yes, we are, Judge. That is it. And they failed to, the commission failed to address that issue at all. They simply said there was no causation. As you can see from their opinion, they reversed the arbitrator's ruling that required a respondent to authorize a recommended surgical procedure because they said it was not, page 17 of my brief is where it starts at the very bottom of the page, injury and issue that was not addressed in arbitrator's ruling. The testifying physicians, Dr. Charles Wright and Timothy Van Fleet, recommended that Petitioner undergo surgery that would stabilize her spinal cord and that stabilizing the spinal cord would reduce the risk of Petitioner suffering paralysis should she fall. But such surgery would not change her symptoms. Both physicians testified that Petitioner's injury brought to light her need for the surgery, but neither testified that the injury itself caused the need. Well, that's, I think, the critical question that I wanted to ask you. I think you can point to some evidence in the record that indicates that the claimant's fall aggravated or exacerbated the existing condition. How do you respond to the latter point that you made? And that would be, what about the argument your opposing counsel could make, well, wait a minute, what this did was this merely caused the treating physicians to become aware of or be aware of the pre-existing condition and the need for surgery. This brought it to our attention. Judge, that's been argued repetitively throughout these proceedings, the arbitrator didn't buy it. I don't know where the commission got the evidence. Well, the commission never bought it, right? Well, it's not there. That's why we believe, I think this should be de novo because I don't think any of the facts... But what did Dr. Wright say? I'm sorry? What did Dr. Wright say? Dr. Wright said that she had an exacerbation of a pre-existing condition, that she definitely had a spinal cord injury, and that he needed to remove the two bulging discs. And he said that we don't know, and this is in both Dr. Wright's testimony as well as Dr. Van Fleet's, we don't know if she would have needed this surgery at all. She definitely needs it now. This stuff about brought it to the light, yeah, it brought it to the light because she fell and cranked her head so hard that they thought she had a subluxation, and she now has two bulging discs and a spinal cord injury, but she didn't have any of these issues before, and he said we don't know if she would have needed the surgery six months from now, five years now, or if at all. But both of them say unequivocally she does need it now because she's got this spinal cord injury, and in fact, Dr. Van Fleet, if you'll look at his testimony, on page 10, well, I'm sorry, that's a letter that he wrote. His testimony begins on page 7. He does say, well, she had a congenital narrowing in her spinal canal, which was no doubt prior to the injury, but I think that predisposed her to the problem that she's experienced. I think that probably predisposed her, but that she had an exacerbation of a preexisting condition. He even says that, and if you look further on page 17 where we address that, where he writes a letter to their nurse practitioner, I believe it was, he goes into great detail as to why he believes that this was an exacerbation. This is not something that we've made up. This is something that both the doctors have said. She was completely asymptomatic prior to this date, and now she requires this surgery to stabilize her spine, and one of the main reasons why she needs it is Dr. Van Fleet says that she would have continued to deteriorate and lose motor skill functions if she didn't have it. I'm going to read something to you. Yes, sir. Van Fleet said the fact that this patient had a fall was not the reason that she needed to have the operation. The reason she needed to have the operation was because of the fact that she had a severe spinal stenosis. I think she had some exacerbation of her cord signal change and perhaps her cervical mildly, whatever he says. Myopathy. Myopathy. If she wanted to avoid getting worse, then she would need to have the operation. Now, again, that's not because of her work injury. That's because of her cervical spondylosis. That's what he testified to. But he also testified that she had an exacerbation exactly in that paragraph you just read, Your Honor. Yeah, but he says that the operation was not necessitated by the fall. The operation would have happened anyways. His only thing was to call their attention to a condition that required an operation. That's what they both testified to. There's two contradictory things that he also says in reference to that, Your Honor. The first thing is we don't know if she would have ever required surgery to begin with. And the second thing is that he says that she will continue to deteriorate, as you said, if she doesn't have this. Yeah, but Van Fleet testifies, says that the claimants' core changes were exacerbated by her fall, but that stenosis didn't change as a result of the fall. Recognition of the fact that she had this problem, which certainly helped along by the fall, because it now became apparent. He explains that the damage that was done from the standpoint of her fall is done, and that the reason going forward to recommend an operation for this individual is not because of her fall, but because it was the fact that she had severe narrowing of the canal and she had a lot of cord signal change. He opines that the claimant could perform sedentary light work. And Wright says the same thing. Wright corresponds that the only thing this fall did was call our attention to a condition that required an operation. Your Honor, with respect to the signal change, though, there was no myopathy. There wasn't any signal changes predating this incident. He even recognizes that fact. We don't have any evidence of that. There was an MRI that he had from 2003. That's one of the other issues we have with respect to what you're saying and why we believe that it's clearly erroneous what the commission found, because there is no evidence of any signal changes. There's no evidence of any bulging discs. And again, both of them testify, we don't know if she would have had to have this surgery. She needs it now because she has a damaged spinal cord. They said that the event called their attention to a condition that required the surgery. And the only thing that the commission did was turn around and said, look, we're not saying she's not entitled to TTD. We're not saying she's not entitled to some permanency award. What we are saying is that the fall did not require the back surgery. The back surgery was required even absent the fall. And if you read right in Van Fleet, they both say it. Well, yes, they do both say it. I'm not disputing that they say that. But the other medical evidence and other testimony they have in there clearly makes this an exacerbation case or an acceleration case. But the point of the matter is no one said it accelerated the need for the surgery. They didn't know when she would need it, if at all. So how does it not? Well, because they both turned around and said the only thing the accident did was call our attention to a condition. It called our attention to a condition that required surgery. But it didn't cause the need for surgery. But when? When would she have needed it? I have no idea when she would have needed it, but that's what they said. Yes, and it brought it to her attention. But as she cranked her head on the floor, absolutely. She now has a damaged spinal cord, and we have to relieve that pressure. That's one of the benefits that Dr. Wright testified, that she would receive is increased blood flow and the decreased pressure on her already injured spinal cord. Just to simplify it for me, you said she hit her head on the floor, and now she has a damaged spinal cord. Yes, she had a spinal cord injury. That's correct. Okay. That's what the signal changes in the myopathy mean, yes, sir. Okay. Have those resolved? Have they resolved? They're going to resolve as best they could. Obviously, I'm sure you are aware, her spinal cord is forever injured. It won't repair itself. And that's one of the issues. And I raise this with the circuit court judge. If you take a hose, a regular garden hose, and you crimp it, and there's a crimp in it, you're going to have decreased flow, just like you would in her spinal cord, because she has compression on that spinal cord, already damaged spinal cord. The nerves shooting down her spine are not flowing as they would. And as Dr. Van Fleet himself says, if she does not have this, and most of what I'm relying on is on page 10, what the other additional things that he wrote regarding her condition. If that's not relieved, she's never going to continue to deteriorate. So we have medical evidence that the fall crimped the hose. She had a spinal cord injury. That's what I'm giving the analogy to. That's correct. There's no evidence suggesting that there was any kind of spinal cord injury prior to that day at all. Just as there's no evidence of the disc bulge. And that's another thing, Justice Hoffman, is that Dr. Wright wanted to remove these bulging discs. There's no evidence that I'm aware of that she had a disc bulge prior to this incident. Okay. I see that amount of time. Is there any? I really encourage you to read the case. No. You have time on your vote. Thank you. Counsel, please. Okay. Please report, counsel. My name is Chris Crawford. I represent the Respondent Critical Foods Court. In response to the petitioner's claim that there's no evidence to suggest that she had prior cervical injuries, Dr. Wright, in fact, stated that much of her symptomatology, when he came to her, could have been coming from her preexisting condition. So he acknowledged that she likely had symptoms prior to this event. Moreover, despite her denials, there was evidence that the petitioner had prior problems in the cervical spine. In this case, there was an exacerbation of a preexisting condition. However, Dr. Van Fleet, in his IME report on May 17, 2006, said that that exacerbation had stabilized and that any symptoms she would likely have symptoms going forward. She needed a surgery. She needed a surgery to clear out the space around the spinal cord to prevent further injury. That's something Dr. Wright likely had. I'm going to be real simple here. Okay. You've got it stabilized. Right. Okay. Is it compensable that if the injury accelerated the, in future, need for shoulder surgery? Is compensation possible? It is. It is. In those instances where there's evidence to show that the permanent character of the injury has been changed, that was not present here. Dr. Wright, in fact, when asked whether or not this accelerated the need for surgery, in his deposition he said, if accelerated, you mean that it brought it to everyone's attention? Well, yeah. I use the analogy, first off, there was no medical evidence about the crimping of the hose. Okay. And likewise, there's no medical evidence. Okay. Let me ask a question. I'm picturing this not so much as crimping of a hose, but I'm picturing the spinal cord being swollen within the spinal canal. And because she had a narrow spinal canal due to stenosis, that then creates, however you want to characterize it, the spinal cord touches bone or whatever, which then can cause pain and so forth and so on. However, when the swelling goes down, that's how it has stabilized. Is that my picture in that round? I think that's what the doctors were saying. Moreover, if you look at Dr. Wright's testimony, again, to the acceleration issue, he stated this surgery wasn't meant to relieve the effects of her injury. It was simply to provide space around the spinal cord to prevent further injury. I think that's an important distinction. From the future. Correct. It provided a measure because she's more subject to having pain as a result of a swollen spinal cord because she already had a narrow spinal canal. She had a narrow spinal canal. And I think with regard to the swelling, Dr. Van Fleet addressed that in his IMU report, stating that from a neurological standpoint and following the incident, she had stabilized. I still have my question. Okay. And my question is, and following up on Justice Stewart's explanation, to clarify and I think have a better idea, yes, we have a narrow. Then we have swelling, which closes that narrow gap. Is there any medical evidence to suggest that it's gone back to the original? Dr. Van Fleet, he said the condition had stabilized from a neurological standpoint. Well, I'm not sure what medically stabilized from a neurological standpoint. I would also say. Because it could stabilize because it closed. It retreated a little bit and it's not going to either expand or retreat. But the point is, it's still closer than it was before the accident. If we look at subsequent medical records from Dr. Wright, Dr. Wright states, she looked pretty good. I wasn't all that concerned. I still think she needs a surgery. She should avoid activities to avoid the risk of injury. Her condition had improved when Dr. Wright saw her in June of 2006. Right. Dr. Wright testified that the decompression surgery would have no effect on the claimant's spinal cord injury as a result of the work accident. That's correct. I mean, that was his testimony. Right. If I could just address the de novo versus manifest weight briefly. This is a manifest weight case. I think the commission addressed causation based upon the testimony of two physicians who said the surgery was not made necessary by the accident. Medical causation is an issue that Your Honor's review manifest weight evidence. It's about whether an opposite conclusion should be achieved given the medical evidence. Well, the evidence is conflicting. So that sort of precludes a de novo, doesn't it, where the evidence is conflicting? Well, yeah. I suppose. I mean, I'm just saying that manifest weight of the evidence is clearly at play here. I mean, there's no question it's a manifest weight case. It is not a de novo case. I mean, forget about it. I won't even waste your time arguing. Okay. But, you know, I think you have to admit that between Wright and Van Fleet, they confused this thing so badly they might have taken things and muddied up water. One minute they say it accelerates. The next minute they say it doesn't. I don't think we made it clear as what acceleration. As far as I can figure out, these two guys are saying, well, it accelerated the need for surgery because without it we would never have known she needed the surgery. That's what they are saying with regard to acceleration. And that's why the surgery came sooner because we found it. I mean, that's all I can figure out they're saying. If you get a chest X-ray and that chest X-ray reveals you have lung cancer after an inhalation injury, it doesn't mean that the job event caused the lung cancer. That's how I liken it. So given the fact that surgery was the only issue on the table, I've also filed a cross-appeal in this case saying that it was error to award TTD past the date of her stabilization. The stabilization date in this case is Dr. Van Fleet's May 17, 2006, IME report or the last time Dr. Wright saw her for a period of time on June 27, 2006. Once a condition is stabilized, TTD is no longer due. If you'll note from the commission's decision, they awarded, well, she would have been entitled to maintenance anyway. Maintenance was not an issue in arbitration. I didn't have the opportunity to argue whether or not maintenance was due. I'm prejudiced by this. Counsel didn't argue that maintenance was due. Maintenance was never an issue. I mean, for them to award maintenance, which is evaluated under a separate set of facts with job searches and those kinds of things, I don't think maintenance was due. Moreover, the only recommended treatment at the time of June 27, 2006, the last time she saw Dr. Wright as it's relevant in this case, was the surgery. And if the surgery is not related, MMI has to be found at that date, and therefore, TTD is not due past that date. Well, we have a problem here because your opponent never responded to your cross-appeal, as near as I can figure out. Pardon me? Your opponent did not respond to your cross-appeal. That's what I said in my reply. And so we've got a little problem here with the argument. But didn't she testify that certain symptoms began with the workplace fall and persisted to the time of her testimony? And that's where I point out in my brief that her claim of symptoms does not match up with the medical evidence. The medical evidence still suggests MMI. She didn't treat for a year. When she went and was treated with Dr. Bassett, she didn't complain about neck complaints. And then furthermore, note that there were only two off-work slips introduced in this case from Dr. Wright's nurse, Ms. Marder. She said she was off work in 2007. Then May 14, 2007, Dr. Wright takes her off work again, never referencing the work injury. Counsel came up here and presented a lot of, well, there's no evidence to suggest that. Therefore, I win. It's his burden. He has to show that evidence exists. The absence of evidence does not satisfy his burden. Again, the medical evidence suggests that MMI was achieved then. The fact that she's symptomatic, she may very well be symptomatic, but that goes to a permanency award. TTD ended and maintenance was not addressed. Well, in fairness to the evidence, can a chain of events analysis support a condition's decision if they so chose? Again, with regard to maintenance, maintenance is awarded after a condition is stabilized. However, I'm entitled to argue that maintenance is not. I mean, without analyzing the job search, never provided that, never provided a demand for both rehab, we hadn't really gotten to that stage yet. TTD was the only thing that was, I mean, then MMI has no. But can't you take the position that, look, she was asymptomatic before the event. She has the event. She remains symptomatic to the time of the hearing. All that, the decompression surgery has absolutely nothing to do with this because it doesn't fix anything. And so she doesn't get the decompression surgery, but she's still temporarily totally disabled because she's symptomatic. She can't work. And that's what she testified to. Actually, though, but Dr. Van Fleet testified that as far as the injury goes, she could work. No, no, I understand that. Yeah, and then even Dr. Wright. Look, if they would have turned around and said, she's not entitled to TTD, I don't think that's against the manifest way of the evidence either. But I think you have to conceive there is evidence in the record to support their decision being at the chance. If it's based upon symptoms, that's fine. And I understand that there is some evidence of symptoms, and I leave it up to you to decide whether or not that's enough to determine that she was at MMI and, therefore, TTD was due up to the date of the hearing. But, again, now we're getting into what symptoms are part of the preexisting condition and what symptoms are part of the injury. Both doctors testified that as far as the injury was gone, the symptoms, as best they could tell, either had resolved or, in Dr. Wright's case, he couldn't commit to it. He said that it was like six-month, when asked, six-month progression with a core contusion like this, is that when you see a stabilization in MMI? And he goes, yeah, that sounds about right. That's consistent with Ms. Marder's notes. She was injured in January. She saw Dr. Wright again in June 27, 2006. Six months after, stabilization was noted. I would ask that the case be remanded for further determination on MMI and that the award of maintenance specifically be reversed, because that was not an issue and that if we were to go back to the Commission and argue that I'd be allowed to present my arguments that maintenance was not due at the time of hearing. And that the Commission's decision regarding denial of the surgery be affirmed as in support of evidence. If there are any more questions? Thank you, counsel. Rebuttal. Mr. Dodds, let me go back to your analogy of crimping the hose. If the hose is crimped, to me, damage has been done to the structure of the hose, which narrows the opening through the hose. Is there any medical evidence in the record that as a result of this accident, her spinal canal was further narrowed? I can't answer that question, but both doctors suggested that there was aggravation or exacerbation of her preexisting spinal stenosis, which I would suggest is what you're referring to. The way I'm getting this is her spinal cord injury caused swelling. Yes. Which can create all kinds of problems, of course. And it had edema, yes. Once the swelling goes down, that's what they talk about as being stabilized, I take it. But was there any actual structural damage to the spinal canal which caused further stenosis? I would suggest, when you say spinal canal, that the two now bulging discs that we have no evidence of would put additional pressure on her spine and narrow her spinal canal, which was part of the surgery that Dr. Wright recommended. She didn't have bulging discs before? Not from any of the evidence that I recall seeing, no. And there was an MRI before. And I wanted to address one of the things that you said, Justice Hoffman, and I didn't address the issue of the TTD. I did in my brief. You're right, I did not file a reply brief. I didn't deem it necessary because all the evidence was before the appellate court here. I didn't feel that it's something that I needed to address. I did address it briefly in my brief, but I didn't deem it necessary because the evidence is all there and I don't think it's required that I do so. But I think that everything that you were arguing was accurate. I did want to read from page 10 of my brief, which was the letter that their own doctor wrote, because it does shed a lot of light, and I hope that you'll read with me. It's on page 10. I'm sorry, Dr. Van Fleet. At this time, the patient does have evidence of congenital canal stenosis, which we're not denying, and has stenosis at this point in time with cord signal changes at C4 and C5 through 6. The relationship of the fall to her current cord signal change is unknown in my estimation. Based upon her congenital stenosis, she may in fact have some preexisting cord signal change. However, this cannot be determined at this time until an MRI scan prior to the fall can be produced, which I had told you all that there was one from 2003. She does have evidence of significant stenosis. However, I would recommend the operation at C4 through 5 and C5 through 6 with anterior cervical discectomy and fusion. I would recommend the surgery due to the fact that she has spinal stenosis and cord signal change, and most likely will continue to deteriorate if her canal is not decompressed. Well, there's no question it's going to deteriorate. She's got preexisting stenosis. Yes. It's going to deteriorate if you don't decompress it, whether she fell or not. But because of the spinal cord injury, Judge. No. He says I would recommend this surgery due to the fact that she has spinal stenosis and cord signal change. Cord signal change is the injury to the spinal cord. So we have two reasons why he's suggesting it. And he talks about deterioration. I did want to say that perhaps you were right. I can't remember which one of you brought it up, but perhaps you're right that both sides could have done a better job with the doctors explaining the legal side of this case to them so that we have a clearer picture. But, you know, I think that this is clearly an exacerbation case without question, and I really don't understand how. It baffles me how they came to this conclusion after the arbitrator reviewed all the evidence and then went again. Forget about the arbitrator. I understand. But we've got a three-sentence paragraph. What do you do with the sentence, the fact that this patient had a fall was not the reason that she needed to have the operation? What do you do with that? Well, when you look at all of the other evidence. Could they have decided in the other direction? Sure they could have. But when you look at all the evidence, how did they reach that conclusion? They don't even tell us that, Judge. Well, these are the doctors. You guys were supposed to question them. You had the burden of proof. But I suggest that all of it shows that the surgery is compensable. And when you say that, why should she bear the burden of having the surgery? Why should she be born to have a surgery to stabilize her spine? Your time is up, Counselor. The Court will take the matter under the guidance of this position. We will stand at recess until the call is heard.